UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

DOLLAREATHA EDWARDS,

        Plaintiff,

    -v-                                    No.  16-CV-8031-LTS-OTW

ROBERT WILKIE, Secretary of the
Department of Veterans Affairs,

        Defendant.

-------------------------------------------------------x

MEMORANDUM OPINION AND ORDER

        Plaintiff Dollareatha Edwards ("Plaintiff" or "Edwards") brings this employment discrimination action, pursuant to Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), against Defendant Robert Wilkie, Secretary of the Department of Veterans Affairs ("VA") ("Defendant" or "Wilkie").  Plaintiff, a former VA employee, alleges that she experienced unlawful discrimination, retaliation, and a hostile work environment because of her disability and gender, and that she was denied reasonable accommodations for her disability.  (Complaint ("Compl."), Docket Entry No. 1.)  Defendant Wilkie now moves, pursuant to Federal Rule of Civil Procedure 56, for summary judgment dismissing Plaintiff's claims.  (Docket Entry No. 101.)  Plaintiff also moves to strike certain of the declarations Defendant filed in support of his motion for summary judgment.  (Docket Entry No. 154.)  The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343.

The Court has considered the parties' submissions carefully.[1]  For the following reasons, Defendant's motion for summary judgment is granted in part and denied in part and Plaintiff's motion to strike is denied as moot.

---

[1]     Plaintiff filed untimely versions of her (i) Opposition to Defendants' Motion for Summary Judgment and to Stay Further Proceedings Pending a Decision on Defendants' Summary Judgment Motion ("Pl. Opp. Br.") and corresponding papers (docket entry nos. 139-141) and (ii) Memorandum of Law in Support of Striking the Expert Report and Declarations of Norman Klein, MD; Linda Dawson and Enid Bloom ("Motion to Strike," docket entry no. 157) without seeking prior leave to do so, and in direct contravention of the Court's orders.  The Court has been exceedingly lenient in extending Plaintiff's deadlines.  On September 12, 2019, Plaintiff asked the Court to hold her opposition deadline in abeyance pending Magistrate Judge Wang's determination on her motion for sanctions.  (Docket Entry No. 115.)  The Court denied Plaintiff's request but gave her an additional four days to file her opposition brief.  (Docket Entry No. 118.)  Following the September request, Plaintiff requested and received three additional extensions.  (Docket Entry Nos. 119, 121, 125, 127, 129, and 131.)  On October 23, 2019, Plaintiff filed her opposition papers, including an "incomplete" memorandum of law (docket entry nos. 132-135) and, the next day, requested a one-day extension to file a complete memorandum of law (docket entry no. 136).  The Court granted the extension and ordered "[n]o further extensions."  (Docket Entry No. 137.)  Plaintiff filed a revised memorandum of law on October 25, 2019.  (Docket Entry No. 138.)  Three days later, without leave, and in direct violation of the Court's order directing "[n]o further extensions," Plaintiff filed yet another set of opposition papers.  (Docket Entry Nos. 139-141.)  Rather than requesting an extension (as required by the undersigned's Individual Practices Rules) Plaintiff simply filed a letter "inform[ing] the Court that she ha[d] submitted revised opposition papers in response to Defendants' Motion for Summary Judgment."  (Docket Entry No. 142.)

Plaintiff similarly violated the Court's orders in connection with her Motion to Strike.  On May 28, 2019, Magistrate Judge Wang directed the parties to file by September 30, 2019, a letter indicating their intention to file Daubert motions.  (Docket Entry No. 83.)  One day after the deadline set by Judge Wang, Plaintiff filed a letter indicating her intention to file a Daubert motion and proposing a deadline of October 30, 2019.  (Docket Entry No. 123.)  On October 30, 2019, Plaintiff requested and received a two-week extension of the Daubert deadline; the Court directed Plaintiff to file her Daubert motion by November 13, 2019.  (Docket Entry Nos. 143, 145.)  On November 14, 2019, again, one day after the court-imposed Daubert motion deadline, Plaintiff requested an extension.  (Docket Entry No. 149.)  Judge Wang granted the request and directed Plaintiff to file her motion by November 23, 2019.  (Docket Entry No. 150.)  On November 23, 2019, Plaintiff filed her Motion to Strike and corresponding papers.

BACKGROUND

       The following summary focuses on facts that are pertinent to the question of whether Defendant is entitled to summary judgment dismissing Plaintiff's claims.  Except as otherwise noted, the following material facts are undisputed.[2]

Plaintiff's Disability

       Plaintiff, Dollareatha Edwards, has suffered from chronic asthma with allergic rhinitis since 1989.  (Pl. Resp. to 56.1 ¶ 51, at 43[3].)  Plaintiff's condition is triggered by dust, pollen, and "strong scents" including "paints, plaster dust, paint thinner, various adhesives, cleaners, deodorizers, perfumes, colognes and cleaning solution."  (Pl. Resp. to 56.1 ¶ 52, at 43-44.)  "[D]epending on the extent of the exposure" to these allergens, Plaintiff "may exhibit" symptoms including dry scratchy throat, headaches, photophobia, coughing, wheezing, nasal

---

    (Docket Entry Nos. 154-156.)  Two days later, without leave, Plaintiff filed a revised memorandum of law in support of her Motion to Strike.  (Docket Entry No. 157.)

    Plaintiff and her counsel are strongly cautioned that, if they anticipate missing a deadline, prior permission to deviate from court-imposed deadlines must be sought in accordance with the relevant rules of this Court.  Because Plaintiff's untimely filings were made just a few days late, and because considering the untimely-filed submissions does not result in any apparent prejudice to the Defendant, the Court has, in this instance, done Plaintiff the courtesy of accepting and considering her later filings.

[2]    The facts presented or recited as undisputed are drawn from the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1, or from evidence as to which there is no non-conclusory factual proffer.  Citations to Defendant's Local Civil Rule 56.1 Statement (Statement of Material Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Def. 56.1"), Docket Entry No. 107) and Plaintiff's Counterstatement (Plaintiff's Repsonse [sic] to Defendants' [sic] Statement of Undisputed Facts Pursuant to Local Rule 56.1 and Plaintiff's Additional Statement of Facts ("Pl. Resp. to 56.1"), Docket Entry No. 141) incorporate by reference citations to the underlying evidentiary submissions.

[3]    The paragraphs in Plaintiff's responsive 56.1 are not consistently numbered.  To avoid confusion, the Court includes page numbers when citing to Plaintiff's responsive 56.1 statement.

congestion, swelling, dry itchy eyes and shortness of breath.  (Pl. Resp. to 56.1 ¶ 53, at 44.)

Plaintiff testified that she was not able to predict when she might encounter a product or odor

that would trigger an allergic reaction.  (Declaration of Special Hagan, Esq., in Support of

Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Hagan Decl."), Docket

Entry No. 140, Exs. 1, 14[4] ("Edwards Dep.") at 85:10-86:11, 300:5-22.)

Employment with the VA

Plaintiff began working at the VA's Manhattan campus in 1982.  (Def. 56.1 ¶ 1.)

From 1986 until her retirement in June 2016,[5] Plaintiff worked as an Engineering Technician in

the Engineering Service department.  (Def. 56.1 ¶ 2.)  In this role, Plaintiff's job functions

included "surveying and investigating building sites at the VA campus; performing technical

calculations and measurements regarding repairs and equipment at the VA campus; surveying

sites at the VA campus to identify the need for upgrades or renovations; preparing designs for

projects at the VA campus; and performing construction management tasks with regard to

ongoing work at the VA campus."  (Def. 56.1 ¶ 4.)  Plaintiff alleges that she performed

"administrative" functions prior to November 2014.  (Pl. Resp. to 56.1 ¶¶ 107-08, at 69.)

Plaintiff also worked as the campus locksmith from November 2010 through November 2012

and again from October 2013 through August 2015, when Plaintiff submitted a "Notice of Intent

to Vacate the Locksmith" position.  (Def. 56.1 ¶ 7; Hagan Decl., Ex. 4 (Declaration of

Dollareatha Edwards in Support of Plaintiff's Opposition to Defendants' Motion for Summary

Judgment ("Edwards Decl.")) ¶ 36).)  Many of these functions, including Plaintiff's functions as

---

[4]     Citations to exhibits to the Hagan Declaration will follow the designation given in the
Declaration itself.

[5]     Plaintiff retired on June 24, 2016, due to her disability.  (Def. 56.1 ¶ 12.)

the campus locksmith, required Plaintiff to be physically present at the VA campus.  (Def. 56.1 ¶ 5.)  Plaintiff was supervised by Christopher Walls, acting chief of engineering, from November 2014 to May 2016.  (Def. 56.1 ¶ 9.)

<u>Alleged Discriminatory Acts</u>

Plaintiff claims that she suffered discriminatory treatment related to her disability and gender.

*Telework Requests*

Under an ad hoc arrangement with a former supervisor, Plaintiff worked from home one or three days per week between 2011 and 2013.  Her telework provisions were terminated in 2013 in connection with allegations that Plaintiff was not performing work while out of the office.  (Edwards Decl. ¶¶ 7-9.)  Plaintiff thereafter made two requests to work remotely through the VA's telework program.  Both requests were denied.  Plaintiff testified that she believed VA employees Sarah Bashker, Nancy Panola, and Samantha Anderson were permitted to telework although Edwards was not.  (Edwards Dep. at 104:7-106:16.)  Plaintiff's supervisor, Mr. Walls, was not involved in responding to Plaintiff's telework requests.  (Def. 56.1 ¶ 33.)

**March 2013 Request**

On March 11, 2013, Plaintiff filed a request for accommodation, seeking "Day-to-Day permission to perform duties remotely, using VPN, when unable to commute to work." (Hagan Decl., Ex. 7.)  In her request, Plaintiff stated that, "[i]n [her] present position, [she] frequently encounter[ed] strong scented odors; such as, perfumes; colognes; cleaning products; deodorizers etc.  As an allergic-asthmatic with a strong sensitivity to scented odors, these encounters cause[d] immediate respiratory distress, headache, nasal congestion, sensitivity to

light, loss of feeling in lips, and coughing.  Some days the recovery time from such exposure [was] short term (several hours); however, on other days the recovery time [was] more long term (a day or two).  Because of the headaches and sensitivity to light caused by [her] allergies, [she was] unable to drive safely until they subside[d] to a tolerable level."  (Id.)

Defendant has proffered records indicating that, on March 27, 2013, Defendant's "reasonable accommodations committee" denied Plaintiff's request because Plaintiff's "current work environment [was] a private office that [was] only utilized by [her]"; "[t]he fragrances from other individuals should [have been] on a limited basis"; she had "no interactions with trees and grass at [her] work station"; and the information she had provided "indicate[d] that [her] symptoms [were] controllable by the medications prescribed by [her] health care provider." (Def. 56.1 ¶ 26.)  It is undisputed that Plaintiff was informed verbally "in or around March or April 2013" that her telework request had been denied.  (Edwards Decl. ¶ 13.)

### May 2013 Request

On May 14, 2013, Plaintiff submitted a second telework request, this time in the form of a "Telework Proposal," rather than a formal request for accommodation.  (Hagan Decl., Ex. 25.)  Plaintiff proposed to telework Wednesday through Friday and Thursday through Friday, respectively, on alternating weeks.  (Id.; Def. 56.1 ¶ 27.)  The "Telework Proposal" did not mention Plaintiff's disability or illness.  Defendant denied Plaintiff's request on July 18, 2013, stating that the request "[did] not meet the criteria [of the telework program]."  (Hagan Decl., Ex. 26.)  Defendant also notified Plaintiff of her right to appeal the decision.  (Id.)  Plaintiff did not pursue an appeal or submit a subsequent request to telework.  (Def. 56.1 ¶ 31.)

*Parking Requests*

In 1991, Plaintiff began parking at the VA using a handicapped placard. (Edwards Decl. ¶ 39.)  She initially parked at the Asser Levy Place facility, located on 23rd Street in between 1st Avenue and FDR Drive.  (Edwards Dep. at 115:9-22.)  Then, from approximately 1992 to June 25, 2015, Plaintiff parked in a handicapped space in the "rear parking area" onsite at the VA's Manhattan campus.  (Id. at 115:23-116:17.)

### December 2014 Request

On December 8, 2014, Plaintiff emailed VA employees Ralph Puma, deputy chief of police, and Jackson Chin, staff assistant to the associate director, concerning onsite parking. (Def. 56.1 ¶ 40.)  She asked about "the procedure for obtaining assigned parking for employees with disabilities," in light of anticipated "project renovations" to the onsite parking lot.  (Id.)  She noted that she had "heard that parking [was] being assigned for external parking areas," and that "[a]ny direction provided [would be] appreciated."  (Id.)  After receiving no response from Mr. Puma or Mr. Chin, Plaintiff sent another email on December 22, 2014, stating that she was "trying to obtain any guidance on how parking is being assigned and what is the procedure for obtaining parking," again noting that "[a]ny direction provided is appreciated."  (Id.)  Plaintiff states that she never received a response to her December emails.  (Edwards Decl. ¶ 42.)

### June 2015 Construction

Defendant has proffered a memorandum announcing that on June 25, 2015, the VA's onsite parking would close to all employees for construction to repair damage sustained

during Hurricane Sandy.  (Edwards Dep., Ex. 5 at DEW000290.[6])  While the onsite parking was under construction, the VA permitted employees to park at another facility, two blocks from the Manhattan campus.  (Id.; Def. 56.1 ¶¶ 34, 37.)  Defendant has offered conflicting testimony concerning which vehicles were permitted to park in the onsite lot during construction.  Mr. Walls testified at Plaintiff's EEO hearing that only government cars and construction workers were allowed to park in the lot.  (Pl. Resp. to 56.1 ¶ 36, at 35-36.)  Mr. Walls later testified that only cars with United States government plates were permitted to park in the lot during construction.  (Id.)  VA employee Jodie Jackson testified that primarily non-government vehicles continued to park in the onsite lot during construction.  (Id.)  Plaintiff has proffered evidence of at least 109 occasions when government and non-government cars were parked in the onsite lot during construction.  (Edwards Dep. at 138-40; Pl. Resp. to 56.1 ¶ 36, at 35-36.)  Plaintiff testified that she observed police, patients, and some VA employees getting into these vehicles. (Edwards Dep. at 139:3-5.)  Plaintiff observed that at least one car that had been issued a permit to park in the VA onsite lot.  (Pl. Resp. to 56.1 ¶ 36, at 35.)

### July 2015 Request

On July 31, 2015, Plaintiff again emailed Jackson Chin about parking at the VA. She stated that, "[s]ince June 25, 2015, [she had] been unable to drive [her] car to work," and that it was costing her $60 to $80 per day to commute to work because she was "unable to commute via public transportation due to [her] illness."  (Def. 56.1 ¶ 41.)  She requested "that [she] be allowed to park in the rear parking lot," and noted that she was "willing to relieve the VA of any damage to [her] vehicle if permission [was] granted."  (Id.)  Four days later, on

---

[6]     Plaintiff testified that she never received this document and that she first learned of the parking lot closing when she arrived to work on June 25, 2015.  (Edwards Dep. at 123:10-13.)

August 3, 2015, Mr. Chin responded by informing Plaintiff that the VA "would not be allowed to grant this request as it [was] not simply a matter of concern over damaging [Plaintiff's] vehicle but for [her] personal safety as well." (Id.) Plaintiff responded the same day by thanking Mr. Chin for responding to her request. (Id.)

Plaintiff took no further action regarding her parking request after receiving Mr. Chin's August 3 email. (Def. 56.1 ¶ 42.) Plaintiff never submitted a formal accommodation request, nor did she request parking at the alternative site located two blocks from the VA's Manhattan campus.[7] (Def. 56.1 ¶¶ 39, 43.)

*Limiting of Job Responsibilities*

Plaintiff states that, when Mr. Walls became her supervisor, he incrementally removed her "administrative job functions" and reassigned those functions to himself and "other male staff." (Edwards Decl. ¶ 30.) According to Plaintiff, Mr. Walls reassigned her administrative tasks "so that [she] could not telework." (Id. ¶ 28.) Plaintiff states that Mr. Walls "eventually reduced [her] job responsibilities to locksmithing." (Id. ¶ 34.)

Mr. Walls held daily meetings with supervisors in the VA's Engineering Service department. (Def. 56.1 ¶ 22.) Plaintiff was not invited to participate in those daily meetings. Defendant represents that Plaintiff was not invited because she was not a supervisor. (Declaration of Christopher Walls ("Walls Decl."), Docket Entry No. 106, ¶ 7.) Plaintiff has not

---

[7]     Plaintiff testified that she was aware of the availability of parking at the alternative site but did not pursue it because she could not park two blocks away from the Manhattan campus. She could not "commute that far on foot" because she would have to "stop every few feet to breathe" and was more likely to encounter odors that would trigger her asthma. (Edwards Dep. at 129:9-18.)

testified that she had been permitted to attend the Engineering Service meetings before Mr. Walls became her supervisor.

*Performance Reviews*

Mr. Walls gave Plaintiff a "Fully Successful" performance rating for work performed between October 1, 2014, and September 30, 2015.  (Def. 56.1 ¶ 19.)  "Fully Successful" was the second-best of three possible ratings.  (Declaration of Rachael L. Doud ("Doud Decl."), Docket Entry No. 103, Ex. I at DEW000303.)  Plaintiff could have received a lower rating of "Unacceptable" or a higher rating of "Exceptional."  (Id.)  Mr. Walls gave at least four other employees ratings of "Fully Successful" for the same evaluation period, and three of those employees were male.  (Def. 56.1 ¶ 20.)  Mr. Walls testified that he rated Plaintiff "Fully Successful," rather than "Exceptional," because she did a "fine" job, but did not go "above and beyond."  (Doud Decl., Ex. B ("Walls Dep.") at 36:12-17, 109:18-110:3.)  Mr. Walls gave "Exceptional" ratings to employees who held supervisory positions.  (Walls Decl. ¶ 9.)

*Gender-related Comments*

Plaintiff testified that she overheard some unidentified VA employees make disparaging comments about female colleagues.  Plaintiff testified that she overheard comments about how other individuals, whom Plaintiff inferred were women based on the duties described, performed their job duties poorly.  (Def. 56.1 ¶ 14.)  Plaintiff also testified that she heard her colleague, Albert Mitchener, make the following comments: (i) "all of you women think you know everything," (ii) "what y'all need is a good man," and (iii) "you know how you women are."  (Id.; Edwards Dep. at 282:25-285:4.)  Plaintiff did not raise Mr. Mitchener's comments to anyone at the VA.  (Def. 56.1 ¶ 14.)  Plaintiff testified that she never heard Mr. Walls make any gender-related comments.  (Def. 56.1 ¶ 15.)

*Walls' Behavior Towards Female Employees*

Plaintiff and other female VA employees testified generally that Mr. Walls treated them more poorly than he would have treated men.  (Pl. Resp. to 56.1 ¶¶ 64-69, 73-81, at 63-65.)  Plaintiff testified that Mr. Walls put her in positions where she would have to deal with confrontational people and that he generally did not support the female employees he supervised.  (Pl. Resp. to 56.1 ¶¶ 64-65, at 63.)  Plaintiff testified that her colleague, Joanne Turnier, was escorted off the VA campus by police officers and that men had not been "treated [that] way."  (Pl. Resp. to 56.1 ¶ 65, at 63.)  Ms. Turnier testified that Mr. Walls generally did not "take [her] side" and, on one occasion, forced her to apologize to the captain of police after she refused to pay him for services she did not order.  (Hagan Decl., Ex. 9 at 39:5-42:17.)  In connection with Plaintiff's EEO investigation, Ms. Turnier testified that she "[didn't] think [Mr. Walls] would talk the way he talks to any of the guys but he [would] with the females."  (Hagan Decl., Ex. 3 at DEW001017:16-18.)

*Exposure to Allergens*

Plaintiff testified that, on an unspecified date in 2015, she was exposed to paint fumes in the stairwell adjacent to her office.  (Edwards Dep. at 194:14-197:20, 259:12-260:14.)  Plaintiff also testified that she was hospitalized "because of [her] exposure to a colleague's perfume in the workplace" on April 12, 2016.  (Hagan Decl., Ex. 42 ¶ 4.)  Plaintiff did not testify as to any other specific incidents when she was exposed to allergens at work.

Cleaning and painting activities were overseen by the VA's Environment Management Service department.  (Walls Dep. at 66:4-15, 155:18-156:4; Walls Decl. ¶ 11.)  Plaintiff testified that she asked Mr. Walls to "reschedule the cleaning crew" and "not to schedule painting or any construction that would provide scent."  (Edwards Dep. at 135:24-

136:6.)  Mr. Walls stated that he "had no control over the cleaning or general painting at the VA

facility; those activities were overseen by the Environment Management Service."  (Walls Decl.

¶ 11.)  Nonetheless, Mr. Walls "ask[ed] the chief of the Environment Management Service to

have the facility cleaned at night, after Ms. Edwards' tour of duty."  (Id.)  According to Plaintiff,

she does not know whether Walls requested the change or not, but the cleaning schedule did not

change.  (Edwards Dep. at 204:10-18.)

Complaints to the Equal Employment Opportunity Office

        On June 25, 2015, Plaintiff initiated an informal EEO pre-complaint with the VA

concerning her disability- and gender-discrimination claims.  (Def. 56.1 ¶ 44.)  Plaintiff followed

this pre-complaint with a formal EEO complaint on August 10, 2015.  (Def. 56.1 ¶ 45.)  After

investigating Plaintiff's claims, the VA issued a Final Agency Decision on July 11, 2016,

concluding that Plaintiff failed to "prove that she was discriminated against based on sex,

disability, or reprisal."  (Def. 56.1 ¶ 46.)

        On November 23, 2015, Mr. Mitchener sent an email to Mr. Walls, copying

Plaintiff and other VA employees, complaining that he had been improperly marked absent from

work on November 20, 2015.  (Def. 56.1 ¶ 24.)  There is no evidence in the record that Mr.

Mitchener's complaint was false, nor is there evidence that Mr. Mitchener knew about Plaintiff's

EEO Complaint.

DISCUSSION

Rule 56 Summary Judgment Standard

        Rule 56(a) of the Federal Rules of Civil Procedure provides that summary

judgment is to be granted in favor of a moving party where that party can demonstrate "that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed R. Civ. P. 56(a); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

For the purposes of summary judgment motion practice, a fact is considered material "if it might

affect the outcome of the suit under the governing law," and an issue of fact is "genuine" where

"the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

<u>Holtz v. Rockefeller & Co. Inc.</u>, 258 F.3d 62, 69 (2d Cir. 2001) (internal quotation marks and

citations omitted).  The moving party bears the burden of demonstrating the absence of a

material fact, and the court must be able to find that, "'after drawing all reasonable inferences in

favor of a non-movant, no reasonable trier of fact could find in favor of that party.'"  <u>Marvel</u>

<u>Entertainment, Inc. v. Kellytoy (USA), Inc.</u>, 769 F. Supp. 2d 520, 523 (S.D.N.Y. 2011) (quoting

<u>Heublein v. U.S.</u>, 996 F.2d 1455, 1461 (2d Cir. 1993)).

   A party that is unable to "make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of proof at

trial" will not survive a Rule 56 motion.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

Specifically, the party who bears the burden of proof at trial "must do more than simply show

that there is some metaphysical doubt as to the material facts and they may not rely on

conclusory allegations or unsubstantiated speculation."  <u>Jeffreys v. N.Y.C.</u>, 426 F.3d 549, 554

(2d Cir. 2005) (citations omitted).  "[M]ere conclusory allegations or denials . . . cannot by

themselves create a genuine issue of material fact where none would otherwise exist."  <u>Hicks v.</u>

<u>Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted).

"[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations

of discrimination to defeat a motion for summary judgment."  <u>Schwapp v. Town of Avon</u>, 118

F.3d 106, 110 (2d Cir. 1997).

Timeliness of Telework-Related Claims

In order to bring a reasonable accommodation claim, or to challenge an employment decision as discriminatory or retaliatory, federal employees must "initiate contact with [an EEO] Counselor within 45 days of the date of the matter alleged to be discriminatory, or, in the case of personnel action, within 45 days of the effective date of the action."  29 C.F.R. § 1614.105(a)(1).  This 45-day period began to run on the dates that Plaintiff's requests to telework were denied.  See Dorns v. Geithner, 692 F. Supp. 2d 119, 130 (D.D.C. 2010) (finding that 45-day period began to run on the date that plaintiff's telecommuting request was denied). Defendant proffers that Plaintiff's March 2013 telework request was denied on March 27, 2013, and Plaintiff acknowledges that she was informed of this denial verbally "in or around March or April 2013."  (Edwards Decl. ¶ 13.)  Her May 2013 telework request was denied on July 18, 2013.  According to Plaintiff, she was aware that her March and May 2013 telework requests were denied as of April and July 2013, respectively.  However, Plaintiff did not "initiate contact with [an EEO] Counselor" until June 25, 2015—far more than 45 days after her telework requests were denied.  Therefore, Plaintiff's claims concerning her telework requests are time-barred, and Defendant's motion for summary judgment is granted as to these claims.[8]

Reasonable Accommodation Claim

Plaintiff claims that she was denied reasonable accommodation, in violation of the RA, when Defendant denied her requests to park onsite at the VA during the construction project.  A plaintiff can establish that her employer failed to provide a reasonable

---

[8]   Plaintiff's efforts to invoke equitable tolling of the limitation period are unavailing, as she acknowledges that she was informed in March or April of 2013, and July 2013, that her telework requests were denied, but she failed to actively pursue recourse until years later.

accommodation by showing (i) that she is an individual who has a disability within the meaning

of the statute,[9] (ii) that an employer covered by the statute had notice of her disability, (iii) that

with reasonable accommodation, she could perform the essential functions of the position held,

and (iv) that the employer has refused to make such accommodations.  Stone v. City of Mount

Vernon, 118 F.3d 92, 96-97 (2d Cir. 1997).  "'[T]he determination of whether a particular

modification is reasonable involves a fact-specific, case-by-case inquiry that considers, among

other factors, the effectiveness of the modification in light of the nature of the disability in

question and the cost to the organization that would implement it.'"  Quadir v. New York State

Dep't of Labor, 39 F. Supp. 3d 528, 539 (S.D.N.Y. 2014) (quoting Staron v. McDonald's Corp.,

51 F.3d 353, 356 (2d Cir.1995)).

Plaintiff has demonstrated disputed issues of material fact as to her parking-

related reasonable accommodation claim.  Because Defendant had notice of Plaintiff's disability

it had a duty to provide reasonable accommodation.  Plaintiff had been using handicapped

parking since 1991.  Plaintiff's December 8, 2014, email made specific reference to her disability

and asked about "the procedure for obtaining assigned parking for employees with disabilities,"

in light of "scheduled project renovations" to the onsite parking lot.  A reasonable fact finder

could conclude from these facts that Defendant had notice of Plaintiff's disability.  See Brady v.

Wal-Mart Stores, Inc., 531 F.3d 127, 135 (2d Cir. 2008) (an employer has a duty to reasonably

---

[9]     The RA defines "disability" to mean either "a physical or mental impairment that
constitutes or results in a substantial impediment to employment," or "(A) a physical or
mental impairment that substantially limits one or more major life activities of such
individual; (B) a record of such an impairment; or (C) being regarded as having such an
impairment [as that term is defined in 42 U.S.C. § 12102(3)]."  29 U.S.C.A. § 705(9)
(Westlaw through P.L. 116-140).  Construing the evidence in the light most favorable to
Plaintiff, the non-moving party, the Court presumes for purposes of this motion practice
that Plaintiff has a disability within the meaning of the RA.

accommodate an employee's disability "if the employer knew or reasonably should have known that the employee was disabled").

Further, there is a genuine dispute as to (i) whether allowing Plaintiff to continue to park onsite during construction would have been feasible or reasonable, and (ii) whether Defendant explored sufficiently alternative reasonable accommodations for Plaintiff.  Defendant denied Plaintiff's request to continue to park onsite during construction, citing risks to Plaintiff's vehicle and personal safety.  (Edwards Dep., Ex. 5 at DEW000292.)  However, VA employees offered disparate explanations about why Plaintiff was not permitted to park onsite: one said only government and construction vehicles were permitted to park onsite, and another said that primarily non-government vehicles continued to park on the lot.  Further, Plaintiff proffers evidence that 109 cars were parked in the onsite lot during construction and that she recognized certain non-construction, non-government employees parking in the lot.[10]  These discrepancies are sufficient to frame genuine and material disputes of fact as to whether onsite parking could have been provided as a reasonable accommodation of Plaintiff's disability.

A reasonable fact finder could further conclude that Defendant's failure to respond to Plaintiff's December emails and its failure to provide Plaintiff with a reasonable alternative to onsite parking constituted an unreasonable failure to accommodate Plaintiff's disability.  See Petrone v. Hampton Bays Union Free Sch. Dist., 568 F. App'x 5, 7 (2d Cir. 2014)

---

[10]     Plaintiff, whose counsel had been granted permission to file photographs of the cars allegedly parked in the lot on physical media rather than through the ECF system, neither filed the photographs (which were designated as Exhibit 12 to the Hagan Declaration) with the Clerk of Court nor provided a courtesy copy to the Court.  (See Hagan Decl. ¶ 14 n.1.)  However, Defendant does not dispute that the photos identified as Exhibit 12 portray cars parked in the disputed area of the VA parking lot.

("As part of an employer's duty to provide reasonable accommodations, it must engage in an 'interactive process' with the employee to find such accommodation.")

For these reasons, Defendant's motion for summary judgment as to Plaintiff's parking-related failure to accommodate claim is denied.

Discrimination Claims

Plaintiff alleges that she was discriminated against based on her disability and gender in violation of the RA and Title VII, respectively. Plaintiff's discrimination claims are evaluated under the three-step burden shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See, e.g., Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).

McDonnell Douglas first requires the plaintiff to proffer evidence establishing a prima facie case of discrimination. 411 U.S. at 802; see, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993). To meet the burden of production required for a prima facie case of discrimination, Plaintiff must show that she (1) is a member of a protected class; (2) was performing her duties satisfactorily; (3) suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination on the basis of her membership in the protected class. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). To establish a prima facie case of discrimination under the RA, Plaintiff must demonstrate that (i) her employer is subject to the RA, (ii) Plaintiff is a disabled person as defined by the RA, (iii) Plaintiff is "otherwise qualified" for the position (meaning that she could perform the essential functions of her job with or without reasonable accommodation), and (iv) Plaintiff suffered an adverse employment action because of her disability. Garvin v. Potter, 367 F. Supp. 2d 548, 560 (S.D.N.Y. 2005). "A plaintiff may support

an inference of . . . discrimination by demonstrating that similarly situated employees of a different [gender or disability status] were treated more favorably." Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999). "In order to make such a showing, the plaintiff must compare herself to employees who are 'similarly situated in all material respects.'" Id. (citations omitted). Disparate treatment between "similarly situated employees" gives rise to a presumption of discriminatory intent.

The second step shifts the burden to the employer to offer some legitimate, non-discriminatory reason for its actions. McDonnell Douglas, 411 U.S. at 802. The employer does not need to prove that the challenged action was not the product of discrimination, but must provide a clear and specific explanation for the action. Gibbs v. Consol. Edison Co. of N.Y., 714 F. Supp. 85, 89 (S.D.N.Y. 1989). The presumption of discrimination arising from the prima facie case drops out upon such a proffer of a legitimate, non-discriminatory reason.

The burden then shifts back to the plaintiff to offer proof that would enable a reasonable fact finder to conclude that the defendant's proffered reason was a pretext for prohibited discrimination. Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 143 (2000); accord Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir. 2000). Plaintiff may rely at the rebuttal stage on the same facts used to establish the prima facie case so long as a preponderance of the evidence would allow a reasonable fact finder to find that a discriminatory violation has occurred. Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 78 (2d Cir. 2001). However, the plaintiff's own conclusory allegations will not suffice to overcome proffered evidence substantiating a defendant's non-discriminatory rationale for the actions. See Jasmin v. Dep't of Labor, No. 04 Civ. 10237 (LTS), 2007 WL 1746909, at *8 (S.D.N.Y. June 15, 2007).

Construing the evidence in the light most favorable to Plaintiff, the non-moving party, the Court presumes that (i) Plaintiff was a member of a protected class by virtue of her disability and gender, and that (ii) she was otherwise qualified for her position and performed her job duties satisfactorily.

*Reassignment of Duties*

Plaintiff asserts that Defendant discriminated against her in violation of Title VII and the RA by removing her job duties and reassigning them to male employees in order to "insure that she would have job functions that would not allow her to telework." (Compl. ¶¶ 94, 120.) Summary judgment dismissing this claim is warranted for several reasons.

Plaintiff cannot establish a prima facie case of discrimination because she has failed to proffer any non-conclusory evidence that any reassignment of her job duties was motivated by discriminatory animus: Plaintiff has not proffered any evidence that Mr. Walls, who allegedly reassigned her duties, harbored any discriminatory animus. Plaintiff makes generalized claims that Mr. Walls mistreated the female employees he supervised, but fails to identify any concrete or objective non-conclusory evidence that Mr. Walls harbored discriminatory animus or treated Plaintiff or other female employees differently based on their gender.

Even if Plaintiff had made the requisite prima facie showing of discrimination, summary judgment would still be warranted as to this claim because Defendant has offered a legitimate explanation, which Plaintiff has not shown to be pretextual, for how Plaintiff's job duties were assigned. Mr. Walls, Plaintiff's supervisor, stated that tasks were handled within the Engineering Service department "in the manner which [he] considered to be most efficient." (Walls Decl. ¶ 6.) In evaluating an employment discrimination claim, "courts must refrain from

intruding into an employer's policy apparatus or second-guessing a business's decisionmaking process."  Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985).

Furthermore, Plaintiff has not proffered any evidence from which a reasonable fact finder could infer that Mr. Walls' explanation was simply a pretext for prohibited discrimination.  The record is devoid of non-conclusory evidence that Mr. Walls harbored discriminatory animus against women, and the causal connection between the reassignment of Plaintiff's duties and her decision to retire, which was based primarily on her asserted inability to commute affordably and safely to work, is too attenuated for a reasonable fact finder to conclude that Mr. Walls reassigned her duties based on her gender or disability.  Therefore, there is no basis for a reasonable jury to "second-guess[] [Mr. Walls'] decisionmaking process" for assignment of tasks.  Id.

*Performance Rating*

Plaintiff asserts that she experienced discrimination in violation of Title VII because her supervisor, Mr. Walls, gave the male employees in her department "Exceptional" performance ratings, while she received a "Fully Successful" rating.  Defendant is entitled to summary judgment as to this discrimination claim because Plaintiff has failed to make a prima facie showing and because Defendant has offered an uncontroverted legitimate explanation for Plaintiff's performance rating.

Plaintiff has failed to demonstrate that receiving a "Fully Satisfactory" performance rating, standing alone, constitutes an adverse employment action.  A "Fully Satisfactory" rating, while not the highest possible achievement, is not a negative performance rating.  Even if "Fully Satisfactory" could be considered a negative rating, "[n]egative evaluations alone, without any accompanying adverse consequence are not adverse employment

actions."  Gamble v. Chertoff, No. 04 Civ. 9410 (WHP), 2006 WL 3794290, at *6 (S.D.N.Y.

Dec. 27, 2006) (internal quotation marks omitted).  Plaintiff has not proffered any evidence that

she suffered adverse consequences as a result of being rated "Fully Satisfactory"—there is no

evidence that Plaintiff was demoted or lost wages, nor is there any evidence linking the

performance rating to the alleged reassignment of duties that was discussed above.  Plaintiff has

not alleged that her retirement was prompted by gender discrimination; according to Plaintiff,

she retired for disability-related reasons alone.  Further, Plaintiff has not proffered any evidence

to support a conclusion that she was entitled to, or should have received, the higher

"Exceptional" rating.

Plaintiff has also failed to proffer any evidence from which a reasonable jury

could infer that her "Fully Satisfactory" rating was motivated by discriminatory animus.

Plaintiff's supervisor, Mr. Walls, evaluated Plaintiff's performance.  There is no non-conclusory

evidence that Mr. Walls harbored any discriminatory animus.  Plaintiff testified that she never

heard Mr. Walls make any gender-related comments.  Plaintiff's evidence of discriminatory

animus consists of her own testimony concerning facially gender-neutral comments made by an

unidentified group of VA employees and comments concerning women made by Plaintiff's

colleague Albert Mitchener.[11]  Plaintiff has not proffered any evidence that the individuals who

made these comments had any involvement with Plaintiff's performance review.  Cf. Vasquez v.

Empress Ambulance Serv., Inc., 835 F.3d 267, 271-73 (2d Cir. 2016) (applying "cat's paw"

theory of liability to conclude that discriminatory intent could be imputed to employer where

---

[11]     Plaintiff alleges that she heard others making negative comments about the job
         performance of unidentified employees she assumes were female, and testified that she
         heard Mr. Mitchener make the following comments: (i) "all of you women think you
         know everything," (ii) "what y'all need is a good man," and (iii) "you know how you
         women are."  (Def. 56.1 ¶ 14; Edwards Dep. at 282:25-285:4.)

adverse employment action was taken by a supervisor "who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such motive and intended to bring about the adverse employment action"). Plaintiff also proffers certain conclusory, speculative testimony from Plaintiff and another female VA employee concerning instances when Mr. Walls treated them more poorly than he would have treated men. However, these proffers are unsubstantiated by evidence of better treatment of men. Thus, they are insufficient to support a finding of discriminatory animus.

There are also no grounds in the record for a reasonable juror to infer discriminatory animus based on evidence of disparate treatment. At least four of Plaintiff's colleagues also received "Fully Successful" performance ratings, and three of those four employees were male. (Walls Decl. ¶ 8.) All of the employees who received "Exceptional" performance ratings held supervisory positions; Plaintiff did not hold a supervisory position. (Id. ¶ 9.) Plaintiff has failed to make the requisite showing that the employees who received higher performance ratings were "similarly situated in all material respects."

Furthermore, Defendant has proffered evidence of a legitimate, non-discriminatory reason for giving Plaintiff a "Fully Successful" performance rating. Mr. Walls testified that he determined that Plaintiff was "Fully Successful" in completing her job duties because "[s]he did her job . . . [and] was doing the job successfully." (Walls Dep. at 36:12-17, 109:18-110:3.) He declined to give her a higher rating because her performance "wasn't above and beyond." (Id.) Plaintiff has failed to controvert this testimony or provide any evidence from which a reasonable jury could conclude that these reasons were merely a pretext for discrimination.

For these reasons, Plaintiff's allegation that her "Fully Successful" rating was motivated by discriminatory animus does not frame a triable issue of fact.

*Disparate Provision of Working Conditions that Plaintiff Requested as Accommodations*

Plaintiff asserts that Defendant engaged in discriminatorily disparate treatment in violation of the RA by allowing other, nondisabled employees to (i) participate in the VA's telework program and (ii) park at the VA's onsite lot during construction. Because Plaintiff's telework-related claim must be dismissed as time-barred, the Court will discuss only Plaintiff's parking-related discrimination claim.

Plaintiff has established a prima facie case of disability discrimination. The denial of Plaintiff's request for onsite handicapped parking was an adverse employment action: Plaintiff proffered evidence that, without the onsite parking, commuting to work became exceedingly difficult and costly. A reasonable fact finder could infer discriminatory animus from Plaintiff's proffer that other, non-disabled people were permitted to park in the onsite lot during construction after Plaintiff had been told that onsite parking was unavailable. There is a dispute as to whether Defendant's reason for the denial was legitimate and non-discriminatory. Defendant asserts that Plaintiff's request to park onsite during construction was denied in order to protect Plaintiff's safety and the safety of her vehicle. However, a reasonable fact finder could discredit Defendant's explanation based on the inconsistent testimony of VA employees and Plaintiff's photographic and observational evidence demonstrating that other, non-disabled persons were permitted to park in the onsite lot during construction. Based on Plaintiff's known disability and the inconsistencies in Defendant's explanations concerning who was permitted to park on the onsite lot, Plaintiff has demonstrated that an issue of fact exists as to whether

Defendant's proffered justification for denying Plaintiff's request to park onsite during construction was merely a pretext for discrimination.

For these reasons, Defendant's motion is granted as to Plaintiff's discrimination claims concerning (i) her telework requests, (ii) reassignment of duties, and (iii) her performance ratings. Defendant's motion is denied as to Plaintiff's discrimination claim concerning her request for handicapped parking.

Retaliation Claims

Plaintiff asserts that Defendant retaliated against her for engaging in activity protected under Title VII and the RA. Retaliation claims by plaintiffs relying on indirect evidence of retaliation are analyzed under the three-step burden-shifting analysis under McDonnell Douglas. Hicks, 593 F.3d at 164. Plaintiff's RA and Title VII claims are both analyzed under this same burden-shifting framework. Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002). To establish a prima facie claim of retaliation, the plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Hicks v. Baines, 593 F.3d at 164. "The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination. The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." Sharpe v. MCI Commc'ns Servs., Inc., 684 F. Supp. 2d 394, 406 (S.D.N.Y. 2010) (internal citations omitted).

If the prima facie case is established, the defendant must "articulate a legitimate, non-retaliatory reason for the adverse employment action." Hicks, 593 F.3d at 164 (internal

quotation marks omitted).  Then, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action."  Id.  The plaintiff can show that retaliation was a substantial reason for the adverse employment action by proving that "a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[;] if the employer was motivated by retaliatory animus, Title VII [or the RA] is violated even if there were objectively valid grounds for the [adverse employment action]."  Id.  However, "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage."  Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 847 (2d Cir. 2013).

Plaintiff contends that she engaged in protected activity when she (i) requested permission to telework, (ii) requested permission to park in the VA's onsite lot during construction, and (iii) filed an EEO complaint in June 2015.  (Compl. ¶¶ 98, 125.)  She asserts that, because she engaged in these protected activities, Defendant retaliated against her by (i) removing her job duties, including excluding her from meetings, (ii) purposefully exposing her to allergens, and (iii) making and condoning false accusations of harassment against her.  (Compl. ¶¶ 99-100, 127-28.)

Plaintiff has failed to proffer any evidence that her requests to telework and park onsite were "protected activity."  These requests did not "clarify to [Defendant] that [Plaintiff was] complaining of unfair treatment due to [her] membership in a protected class."  Sharpe, 684 F. Supp. 2d at 406 (internal citations omitted).  Plaintiff's requests made no complaints whatsoever and were simply requests for particular working conditions.  At best, they referred vaguely to health conditions: her parking requests mention "[her] illness" and request information "for employees with disabilities," and her March 2013 telework request mentions that Plaintiff is "an allergic asthmatic."  (Edwards Dep., Ex. 5 at DEW000291, 293; Hagan Decl.,

Exs. 7 and 25.)  Plaintiff's May 14, 2013, telework request did not mention her illness or disability.

Furthermore, Plaintiff has not proffered any evidence from which a reasonable fact finder could conclude that the allegedly retaliatory conduct was undertaken in reaction to plaintiff's telework and parking requests.  There is no temporal basis for inferring a causal link between the reassignment of Plaintiff's job duties and her request to telework because Plaintiff's last telework request was denied in July 2013, and Plaintiff testified that Mr. Walls did not begin to reassign her job duties until January 2015.  (Edwards Dep. at 108:16-109:9.)  A 17-month lapse in time between the alleged protected activity and the retaliatory action is too long to support a causal inference.  Further, Mr. Walls was not involved in responding to Plaintiff's telework request.  (Edwards Dep. at 101:14-102:8; Walls Decl. ¶ 10.)

Plaintiff has not proffered any evidence that she was excluded from Engineering Service meetings in retaliation for requesting telework or on-site parking.  Plaintiff testified conclusorily that Mr. Walls regularly met with "men," but did not schedule meetings with "women" during the time that she reported to him.  (Edwards Dep. at 344:25-345:10.)  Plaintiff did not offer any evidence concerning who, specifically, Mr. Walls met with, or the positions those men held.  Defendant has proffered uncontroverted evidence that Mr. Walls's "practice was to hold daily meetings with the supervisors in the Engineering Service [department].  Ms. Edwards was not included in those meetings because she was not a supervisor."  (Walls Decl. ¶ 7.)  Thus, Plaintiff has failed to identify a genuine dispute as to the reason for her exclusion from supervisory meetings.

Similarly, Plaintiff has failed to proffer any evidence that Mr. Walls or any other VA employee intentionally exposed her to noxious fumes in retaliation for complaining about

discrimination.  Plaintiff testified that she asked Mr. Walls to "reschedule the cleaning crew" and "not to schedule painting or any construction that would provide scent."  (Edwards Dep. at 135:24-136:6.)  Mr. Walls stated that he "had no control over the cleaning or general painting at the VA facility; those activities were overseen by the Environment Management Service." (Walls Decl. ¶ 11.)  Nonetheless, Mr. Walls "ask[ed] the chief of the Environment Management Service to have the facility cleaned at night, after Ms. Edwards' tour of duty."  (Id.)  Plaintiff does not genuinely dispute these facts.  She acknowledges that she does not know whether Mr. Walls made the request and can only say that the use of cleaning products did not change. (Edwards Dep. at 204:10-18.)  She makes no factual proffers that would support an inference of intention to subject her to harmful odors on the part of Mr. Walls or anyone else at the VA. Therefore, no reasonable jury could find a causal link between her exposure to allergens and her protected activity.

Plaintiff also alleges that her colleague, Mr. Mitchener, made a false harassment complaint against her and that Mr. Walls failed to discipline Mr. Mitchener for making that false complaint.  Plaintiff alleges that these actions were taken in retaliation for her June 25, 2015, EEO complaint.  However, Mr. Mitchener's complaint, which was made in November 2015, five months after Plaintiff's EEO complaint, was too far removed for a reasonable fact finder to draw an inference of retaliation based on temporal proximity.  See Hollander v. American Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990) (holding that the passage of three months between plaintiff's complaint and the alleged adverse action is too long to suggest a causal relationship); see also Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation.").  Further, Plaintiff proffers no evidence that Mr. Mitchener

knew about her EEO complaint; to the contrary, Plaintiff testified that she does not allege that Mr. Mitchener's complaint was in any way prompted by her EEO complaint.  (Edwards Dep. at 208:18-209:10.)  Plaintiff has also failed to proffer any evidence that Mr. Mitchener's complaint was false.  Mr. Mitchener's complaint (and Mr. Walls's alleged failure to discipline him for making it) would only constitute an adverse action if the complaint were untrue.  Otherwise, Mr. Mitchener was simply engaging in the same type of protected activity for which Plaintiff now seeks vindication.

Because Plaintiff has failed to proffer a prima facie case of discriminatory retaliation, the Court grants Defendant's motion for summary judgment as to Plaintiff's Second and Fifth Causes of Action.

Hostile Work Environment and Constructive Discharge Claims

Plaintiff asserts that, while she was employed by the VA, she was subjected to a hostile work environment in violation of the RA, and that she was constructively discharged because that hostile work environment forced her to retire.  In order to establish a hostile work environment claim, a plaintiff must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks omitted); see also Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 723-24 (2d Cir. 2010).  Mistreatment, however severe, cannot constitute a violation of the RA without evidence that Plaintiff's protected characteristic was the reason for the mistreatment.  See Alfano v. Costello, 294 F.3d 365, 377-78 (2d Cir. 2002) (finding that incidents not motivated by plaintiff's sex could not support a hostile work environment claim in gender discrimination case).

"The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign."  Shultz v. Congregation Shearith Israel of N.Y.C., 867 F.3d 298, 308 (2d Cir. 2017) (internal quotation marks omitted).

The conduct Plaintiff identifies as hostile—the denial of her telework and parking requests and occasional exposure to noxious fumes—does not suffice to demonstrate that Plaintiff was subject to a workplace that was so "permeated with discriminatory intimidation, ridicule, and insult" as to create a legally actionable hostile work environment.  Defendant's conduct, viewed both collectively and individually, is insufficiently hostile or intolerable as to support a hostile work environment or constructive discharge claim.  Furthermore, Plaintiff has not proffered any evidence that the denial of her telework request or occasional exposure to noxious fumes were at all linked to her disability.  A reasonable fact finder could, however, conclude that Defendant's discriminatory denial of Plaintiff's request to park onsite at the VA campus, combined with the resulting prohibitive expense that Plaintiff incurred to commute to work ($300 to $400 per week), created conditions that became "so intolerable that a reasonable person in [Plaintiff's] position would have felt compelled to resign."  Shultz, 867 F.3d at 308.

For these reasons, Defendant's motion for summary judgment is granted as to Plaintiff's Third Cause of Action to the extent that it brings claims related to the denial of Plaintiff's telework requests and exposure to noxious fumes.  Defendant's motion is denied as to Plaintiff's constructive discharge claim related to the denial of Plaintiff's parking request.

<u>Motion to Strike</u>

Plaintiff filed a motion to strike the declarations of Dr. Norman Klein, M.D., Linda Dawson, and Enid Bloom in connection with Defendant's summary judgment motion. (Docket Entry No. 154.)  Because the Court's foregoing analysis does not rely on any of these declarations, the Court need not consider them.  Therefore, Plaintiff's motion to strike is denied as moot.

CONCLUSION

The Court denies Defendant's motion for summary judgment as to Plaintiff's First and Third Causes of Action to the extent they bring claims related to Defendant's denial of Plaintiff's parking requests.  Defendant's motion for summary judgment is granted as to all other claims.  Plaintiff's motion to strike is denied as moot.  The final pretrial conference in this case is currently scheduled for **August 7, 2020, at 10:00 a.m.**  The parties are directed to schedule a settlement conference with Magistrate Judge Wang and to consult with each other and make submissions in advance of the final pretrial conference as provided in the Pre-Trial Scheduling Order (Docket Entry No. 55).

This Memorandum Opinion and Order resolves Docket Entry Nos. 101 and 154.


SO ORDERED.

Dated: New York, New York
       May 29, 2020


     /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge